# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

K.G., a minor, by and through his
parents and next friends, SUZANNE
GOSCH and KEVIN GOSCH,

        Plaintiffs,

vs.

SERGEANT BLUFF-LUTON
COMMUNITY SCHOOL DISTRICT,
MIRANDA RIEDIGER, KELLY
ADAMS, and DOES 1-30,

        Defendants.

No. C 15-4242-MWB

**OPINION AND ORDER
REGARDING THE DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

_____

## TABLE OF CONTENTS

I.    **INTRODUCTION**.................................................................3
   A.    *Factual Background* ..................................................3
       1.    *The parties*....................................................3
       2.    *KG's education and behavioral plans at school* ......................4
       3.    *The incident* ..................................................5
       4.    *The aftermath* ................................................7
   B.    *Procedural Background* .............................................7
       1.    *Administrative proceedings* ..................................7
       2.    *Judicial proceedings* ........................................8
          *a.*    *The pleadings* .........................................8
          *b.*    *Subsequent proceedings* ...............................9

II.    **LEGAL ANALYSIS** ...............................................9
   A.    *Standards For Summary Judgment* ...........................10
   B.    *Failure To Exhaust Claims* ....................................11
       1.    *Arguments of the parties*.....................................11
       2.    *Analysis* ...................................................12
          *a.*    *The test established in* **Fry** ......................12

              *b.     The Circuit's application of* **Fry** ............................. *20*

              *c.     Application of* **Fry** *here* ........................................ *23*

    *C.     The § 1983 Claims* ................................................ *28*

        *1.     Arguments of the parties* ............................................. *28*

        *2.     Analysis* ....................................................... *30*

              *a.     The Fourth Amendment "seizure" claim* ................... *30*

              *b.     The Fourteenth Amendment "substantive due process" claim* ..................................................... *33*

              *c.     Qualified immunity* ............................................. *35*

    *D.     The Disability Discrimination Claims* ........................................... *37*

    *E.     The Common-Law Claims* ....................................... *38*

        *1.     The negligence claim* .................................................. *38*

        *2.     The battery claim* ....................................................... *40*

        *3.     The "intentional infliction of emotional distress" claim* ........................................................................... *41*

*III.    CONCLUSION* ............................................................. *41*

This litigation arises from an incident in which a special education teacher allegedly "dragged" a seven-year-old autistic child across a classroom floor causing him serious carpet burns. The parties dispute not only the reasonableness of the teacher's conduct in the circumstances, but whether the parents' claims on the child's behalf are merely repackaged versions of unexhausted claims under the Individuals with Disabilities Education Act (IDEA) or viable claims of violations of the Fourth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act (ADA), § 504 of the Rehabilitation Act, and state common-law. Thus, one of the key issues is the proper application of the United States Supreme Court's recent

clarification, in *Fry v. Napoleon Community Schools*, No. 15-497, 2017 WL 685533 (S. Ct. Feb. 22, 2017), of the test to determine when ostensibly non-IDEA claims require exhaustion of administrative remedies under the IDEA.

# I.    INTRODUCTION
## A.    Factual Background

This statement of the factual background does not necessarily set out all the parties' factual allegations in support of and resistance to the defendants' Motion For Summary Judgment. Rather, it focuses on the key facts to put the parties' disputes in context. To that end, I have also supplemented this factual statement with some facts drawn from the Complaint and Answer, where I deemed it appropriate to do so. Unless otherwise indicated, the following facts are undisputed.

### 1.    The parties

Plaintiffs Kevin and Suzie Gosch were married in 1999 and have three children: Lexie (age 17), Ella (a fourth-grader), and KG (born November 5, 2006). KG was placed with Kevin and Suzie Gosch as foster parents to adopt. KG had health issues from birth and, as he progressed into a toddler, he showed signs of autism. Ella and KG were in the same classroom in Mapleton, Iowa, for pre-school and kindergarten. At some point, the Gosches moved to Sergeant Bluff, Iowa, to take advantage of available services. Ella and KG were in the same classroom, again, for the first semester of first grade in Sergeant Bluff.

The defendants are the Sergeant Bluff-Luton Community School District (the District), Miranda Riediger, who was a special education teacher at the District's Primary School during the 2013-2014 school year, and Kelly Adams, who was the Principal at the District's Primary School during the 2013-2014 school year. The parties agree that Riediger has special training and certification to teach special education classes, but the

Gosches deny that she had all necessary training. Specifically, the Gosches point out that Riediger did not have "Mandt training" relating to handling of problem behaviors until after the incident giving rise to their claims.

### 2. *KG's education and behavioral plans at school*

The Gosches contend that KG had few problems in school in Mapleton, although they admit that there were times when he would just lay down on the floor and cry. The Gosches also allege that, prior to moving to Sergeant Bluff, no one at home or at school had ever held KG down or forced him to move when he was displaying behavioral problems. The defendants admit only that this is the Gosches' testimony. The Gosches contend that, at the Sergeant Bluff Primary School, KG liked his first semester teacher and classroom, but hated being pulled out for the last ten minutes of the day to go to the special education room with defendant Riediger, because he said that she was "mean" to him. The defendants deny this allegation. The Gosches contend that there were three instances, prior to the incident giving rise to their claims, during which a paraprofessional, a school resource officer, and Principal Adams, respectively, had allegedly grabbed, dragged, or held down KG, but the defendants dispute the facts concerning these incidents.

KG had an Individualized Education Plan (IEP) in place concerning special education services. He also had a Functional Behavior Assessment (FBA), which identified behaviors of concern, including crying, hitting, kicking, and screaming. KG also had a Behavior Intervention Plan (BIP) after he began to act out in the Sergeant Bluff school, but the defendants deny the Gosches' contention that the BIP was put in place as a result of KG acting out because he did not like going to Riediger's room. The first BIP was put in place in the middle of the first semester of KG's first year at Sergeant Bluff, on October 21, 2013, and was written by Riediger. The BIP stated, in part, that the "special education teacher/general education teacher/paraeducator" will be responsible

to implement the BIP's "Safety Plan."  The "Safety Plan" stated, in part, that, when KG's behaviors escalated, ". . . students will be removed and furniture will be repositioned to keep [KG] and others safe."

### 3.  *The incident*

The incident giving rise to the Gosches' claims occurred on January 30, 2014, when KG was in the second semester of first grade.  Three adults were present in the classroom at the time:  Riediger and paraprofessionals Sandra Vondrak and Luann Johnson.  When it was time for KG to switch from drawing to writing sentences, KG did not want to, so he got down on the floor.  Riediger first tried a technique called the "Incredible Five Point Scale," where she told KG that he was at a "3" and asked him what he could do to get back to a "1."  KG did not respond, so Riediger got down to his level and tried to talk to him.  Again, KG did not respond, so Riediger tried to use his "first/then" cards, explaining that if he did his writing first, then he could move to a preferred activity.  That also did not work.  The Gosches contend that KG's behavior, consisting of flailing around and whining, was consistent the whole time he was on the floor.  The defendants agree that KG was flailing and whining, but contend that KG's behavior then "escalated."  The parties agree that, at some point, KG was also kicking.

Riediger stepped away from KG in the hope that he would begin to "de-escalate" on his own, but he did not.  Vondrak, and at some point Riediger, stood between KG and other students to keep KG from potentially making physical contact with any of them.  The parties dispute at what point the other children should have been removed from the classroom, but do not dispute that they never were removed during this incident.  KG's shirt rode up more than once during the incident, and Riediger pulled it back down, although the parties dispute whether she did so to cover his body or to keep him safe.  At some point, Riediger also tried to return to the "Incredible Five Point Scale" to try to de-escalate KG's behavior, but, again, without success.  The parties dispute precisely how

much KG moved from his original location on the floor, but apparently agree that any movement was gradual. They also dispute how close KG was getting to the teacher's heavy desk, but do no dispute that Riediger did not believe that she could move the desk out of the way. The incident continued in this manner for ten minutes.

Riediger says that she became concerned that KG was moving closer to the heavy desk, so she stepped behind him and tried to slide her arms under his armpits, hoping to walk him into an open area of the classroom (or to an area sometimes described as a "chill out zone"). KG responded by throwing his head back, flailing his arms and continuing to kick. Riediger then went around KG and grabbed his legs, planning to move him to an open area. The defendants contend that Riediger took no more than two steps backward, moving KG approximately four feet, but the Gosches contend that, based on Riediger's height, Riediger "dragged" KG for a distance that could have been more than four feet. The parties agree that KG yelled something like, "ow, my back," and Riediger stopped moving him. KG had not complained about his back or any pain prior to that time.

KG was taken to the school nurse. Eventually, school officials were able to contact Kevin Gosch, and he picked up KG from school.[1]

---

[1] Based on the Complaint and Answer, the parties dispute what attempts were made to contact KG's parents, and what occurred when Kevin Gosch got to the school, including what statements were made by Riediger and Adams. The parties did not address these matters in their respective statements of material facts, however. I have included in the body only the additional facts, drawn from the Complaint and Answer, that the parties agree that Kevin Gosch was contacted and picked KG up from school after KG had been taken to the school nurse, to complete the context of the incident.

### *4.      The aftermath*

The Gosches took photographs of KG's back at home, either the evening after the incident or the next morning.  Medical professionals at Mercy Medical Center examined KG the day after the incident.  One medical professional opined,

> [T]hese injuries are consistent with inflicted forceful dragging [and] are consistent with partial thickness skin burns from excessive force in dragging the child on a carpeted surface. It would be my opinion that these injuries are significant and indicative of inflicted injuries beyond what is considered normal care and discipline of a 7-year-old child.

The defendants do not dispute that this is what the medical opinion states, but dispute that any injury was "inflicted" on KG.

Principal Adams agreed with the statement that KG was a "pretty high functional autistic kid" when he started with the District.  Although the defendants admit that their own expert has stated that KG's misbehaviors increased in intensity, duration, and frequency after the incident, the defendants dispute that the incident was the cause of these changes.  The defendants also deny that the incident was the cause of KG's behavioral changes described by his family members, including being depressed, withdrawn, fearful, angry, violent, and flinching when they mention school.  The Gosches have offered expert opinions that KG now suffers from Post-Traumatic Stress Disorder (PTSD) and other psychological and behavioral issues as a result of the incident.

The Gosches have enrolled KG in a different school district.

### B.      Procedural Background

### *1.      Administrative proceedings*

The defendants described the administrative proceedings in their statement of material facts, but the Gosches contend that it is improper to include the findings from the administrative proceedings as part of the factual background on claims being litigated

in court. As will become clear, in the legal analysis to follow, the fact of the administrative proceedings and the nature of the claims asserted therein are of some relevance to the defendants' argument that the Gosches failed to exhaust administrative remedies as to their claims.

On or about February 17, 2014, Gosches filed an administrative complaint with the Iowa Department of Education, (IDOE), in which they alleged that the District had violated the requirements of Part B of the federal IDEA with respect to the January 30, 2014, incident involving KG. In their administrative complaint, the Gosches alleged the following:

> 1. [O]n January 30, 2014, K.G.'s special education teacher drug K.G. by his feet across the carpeted classroom floor to stop him from possible [sic] causing injury to another student[;]
>
> 2. K.G.'s special education teacher did not follow K.G.'s Behavior Intervention Plan ("BIP") in regard to removing other students from the classroom as outlined in the Safety Plan section of his BIP[;] and
>
> 3. [S]chool officials failed to contact either parent or an emergency contact following the incident.

Defendants' Appendix at 43 (Decision, State Complaint 14-04, p. 2). The Gosches also alleged that KG "was thereby denied a free appropriate public education ('FAPE')[,]" and they claimed that their son's procedural safeguards were violated. The IDOE denied their administrative complaint on July 7, 2014. Neither party sought judicial review.

### 2. Judicial proceedings

#### a. The pleadings

On December 1, 2015, the Gosches filed their Complaint in these proceedings, asserting six claims arising from the incident on January 30, 2014. Those claims are the following: (1) a claim for excessive use of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, against

Riediger and Adams; (2) a claim for discrimination in violation of Title II of the ADA, 42 U.S.C. § 12131, against the District; (3) a claim for violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, against the District; (4) an Iowa common-law claim of "general negligence" against Riediger, Adams, and the District; (5) an Iowa common-law claim for the intentional tort of battery against Riediger; and (6) an Iowa common-law claim for intentional infliction of severe emotional distress against Riediger, Adams, and the District. The defendants jointly filed an Answer on December 23, 2015, denying the Gosches' claims and asserting affirmative defenses, including failure to exhaust administrative remedies, immunity of the individual defendants to suit, and immunity of the District to the plaintiffs' common-law claims.

This matter is currently set for trial to begin on May 30, 2017.

### b.     Subsequent proceedings

The defendants filed a Motion For Summary Judgment on December 23, 2016, and a Corrected Motion For Summary Judgment on January 20, 2017. The defendants identified the grounds for their motion, at least generally, as the Gosches' failure to exhaust remedies available under the IDEA; the lack of factual support for a claim of excessive force; the qualified immunity of the individual defendants; the Gosches' failure to demonstrate the denial of any benefit based on disability as required on the disability claims; and the insufficiency of the Gosches' common-law tort claims for various reasons. The Gosches filed their Resistance on February 10, 2017, and the defendants filed a Reply on February 17, 2017.

## II.     LEGAL ANALYSIS

The defendants' Motion For Summary Judgment addresses all of the Gosches' claims. I will address the claims, in turn. First, however, I will summarize the standards for summary judgment, then consider the defendants' over-arching contention that the

Gosches failed to exhaust their administrative claims pursuant to the IDEA, so that they cannot now pursue any of those claims in court.

### A.    *Standards For Summary Judgment*

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burdens, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, --- U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weigh-

> ing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I turn to the issues raised in the defendants' Motion For Summary Judgment.

### B.      Failure To Exhaust Claims

The defendants' first contention is that the Gosches cannot pursue their claims, because they did not exhaust administrative remedies under the IDEA. The Gosches disagree.

### 1.      Arguments of the parties

The defendants argue that the Gosches' ostensibly non-IDEA claims seek the functional equivalent of remedies that were available to them under the IDEA. The defendants contend that, this being so, the Gosches were required to exhaust

administrative remedies on those claims pursuant to 20 U.S.C. § 1415(*l*).  Because the Gosches did not do so, the defendants contend, they cannot now pursue judicial remedies. The Gosches argue that their non-IDEA claims do not require exhaustion under existing law, but even if they do, they have fulfilled the requirement by submitting a state complaint to the district.

### 2.    Analysis

The parties' briefs on the issue of administrative exhaustion requirements under the IDEA were filed before the Supreme Court's decision in *Fry v. Napoleon Community Schools*, No. 15-497, 2017 WL 685533 (S. Ct. Feb. 22, 2017).  Therefore, I will not look at authorities superseded—even if not specifically overruled—by *Fry*, but will focus on the impact of *Fry* on exhaustion of the Gosches' claims.

In *Fry*, the Supreme Court clarified the appropriate test for determining when the IDEA's exhaustion requirement applies to claims brought under other laws.  The Eighth Circuit Court of Appeals has so far applied *Fry* only once, without specifically addressing whether it overrules any IDEA exhaustion test previously applied in this Circuit, in *J.M. v. Francis Howell Sch. Dist.*, No. 16-1756, ___ F.3d ___, 2017 WL 894460 (8th Cir. March 7, 2017).  In *J.M.*, the Eighth Circuit Court of Appeals also reached a question that the Supreme Court did not in *Fry*.  Thus, I will examine the test established in *Fry*, the application of that test by the Eighth Circuit Court of Appeals in *J.M.*, as well as that court's holding on an additional question, and then turn to application of the *Fry* test in this case.

### a.    The test established in **Fry**

In *Fry*, the Court unanimously agreed on the formulation of the test for when IDEA exhaustion is required.  Justice Kagan wrote an opinion joined by five other justices, while Justice Alito filed an opinion concurring in part and concurring in the judgment, in which Justice Thomas joined.

As Justice Kagan explained,

> The Individuals with Disabilities Education Act (IDEA or Act), 84 Stat. 175, as amended, 20 U. S. C. §1400 *et seq.*, ensures that children with disabilities receive needed special education services. One of its provisions, §1415(*l*), addresses the Act's relationship with other laws protecting those children. Section 1415(*l*) makes clear that nothing in the IDEA 'restrict[s] or limit[s] the rights [or] remedies' that other federal laws, including antidiscrimination statutes, confer on children with disabilities. At the same time, the section states that if a suit brought under such a law 'seek[s] relief that is also available under' the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures.

*Fry*, 2017 WL 685533 at *3. In *Fry*, the Court "consider[ed] the scope of that exhaustion requirement," and held "that exhaustion is not necessary when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the Act calls a 'free appropriate public education [(FAPE)].' §1412(a)(1)(A)." *Id.*

In reaching this conclusion, Justice Kagan began with the language of the "exhaustion" provision of the IDEA, which states, as follows:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including §504], or other Federal laws protecting the rights of children with disabilities, *except that* before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(*l*) (emphasis added). Justice Kagan explained,

> The first half of § 1415(*l*) (up until 'except that') 'reaffirm[s] the viability' of federal statutes like the ADA or Rehabilitation Act 'as separate vehicles,' no less integral than

the IDEA, 'for ensuring the rights of handicapped children.'
H. R. Rep. No. 99-296, p. 4 (1985); see *id.*, at 6. According
to that opening phrase, the IDEA does not prevent a plaintiff
from asserting claims under such laws even if, as in *Smith [v.
Robinson*, 468 U. S. 99 (1984),] itself, those claims allege the
denial of an appropriate public education (much as an IDEA
claim would). But the second half of §1415(*l*) (from 'except
that' onward) imposes a limit on that 'anything goes' regime,
in the form of an exhaustion provision. According to that
closing phrase, a plaintiff bringing suit under the ADA, the
Rehabilitation Act, or similar laws must in certain
circumstances—that is, when 'seeking relief that is also
available under' the IDEA—first exhaust the IDEA's
administrative procedures.

*Fry*, 2017 WL 685533 at *6. As in *Fry*, "[t]he reach of that requirement is the issue in this case." *Id.*

In *Fry*, a child with a severe form of cerebral palsy that significantly limited her motor skills was denied permission to bring her trained service dog, Wonder, with her into her kindergarten classroom, on the ground that her needs were being met through services, including human assistants, to which the school had already agreed. As a result, the child's parents removed her from the school and began homeschooling her. *Id.* at *6-*7. The Frys filed an administrative complaint with the U.S. Department of Education's Office for Civil Rights (OCR) charging that the school's exclusion of the service animal violated the child's rights under Title II of the ADA and § 504 of the Rehabilitation Act. *Id.* at *7. The OCR agreed, "even if [the school's] use of a human aide satisfied the FAPE standard." *Id.* In response, the school agreed to let Wonder join the child at school, but the Frys found a different public school, in a different district, for their child to attend, out of fear that the school administration would "resent" the child and make her return difficult. *Id.*

Litigation followed:

The Frys then filed this suit in federal court against the local and regional school districts in which Ezra Eby [school] is located, along with the school's principal (collectively, the school districts). The complaint alleged that the school districts violated Title II of the ADA and §504 of the Rehabilitation Act by 'denying [E. F.] equal access' to Ezra Eby and its programs, 'refus[ing] to reasonably accommodate' E. F.'s use of a service animal, and otherwise 'discriminat[ing] against [E. F.] as a person with disabilities.' According to the complaint, E. F. suffered harm as a result of that discrimination, including 'emotional distress and pain, embarrassment, [and] mental anguish.' In their prayer for relief, the Frys sought a declaration that the school districts had violated Title II and § 504, along with money damages to compensate for E. F.'s injuries.

*Fry*, 2017 WL 685533 at *7 (citations omitted). After dismissal by the district court for failure to exhaust claims pursuant to the IDEA and affirmance by the Sixth Circuit Court of Appeals, the Supreme Court granted certiorari "to address confusion in the courts of appeals as to the scope of § 1415(*l*)'s exhaustion requirement." *Id*. at *8.

At the outset of her analysis, Justice Kagan summarized the Court's conclusion, as follows:

> Section 1415(*l*) requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar laws when (but only when) her suit 'seek[s] relief that is also available' under the IDEA. *We first hold* that to meet that statutory standard, a suit must seek relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.' *We next conclude* that in determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint.

*Fry*, 2017 WL 685533 at *8 (emphasis added; footnote omitted).

As to the first holding, Justice Kagain explained that the Court "agree[d] with the parties' shared view:  The only relief that an IDEA officer can give—hence the thing a plaintiff must seek in order to trigger § 1415(*l*)'s exhaustion rule—is relief for the denial of a FAPE."  *Id.*  More specifically, she explained,

> *For that reason, §1415(l)'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a free appropriate public education. If a lawsuit charges such a denial, the plaintiff cannot escape §1415(l) merely by bringing her suit under a statute other than the IDEA*--as when, for example, the plaintiffs in *Smith* claimed that a school's failure to provide a FAPE also violated the Rehabilitation Act. Rather, that plaintiff must first submit her case to an IDEA hearing officer, experienced in addressing exactly the issues she raises. *But if, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required.* After all, the plaintiff could not get any relief from those procedures: A hearing officer, as just explained, would have to send her away empty-handed. And that is true even when the suit arises directly from a school's treatment of a child with a disability—and so could be said to relate in some way to her education. A school's conduct toward such a child— say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA. *A complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to §1415(l)'s exhaustion rule* because, once again, the only 'relief' the IDEA makes 'available' is relief for the denial of a FAPE.

*Fry*, 2017 WL 685533 at *10 (emphasis added).

Justice Kagan noted that an "important question remains:  How is a court to tell when a plaintiff 'seeks' relief for the denial of a FAPE and when she does not?"  *Id.* Again, the Court agreed with the parties that "[w]hat matters is the crux—or, in legal-

16

speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.* "That inquiry makes central the plaintiff's own claims, as § 1415(*l*) explicitly requires," because it focuses on the statutory language "'seeks' relief available under the IDEA," not a stricter exhaustion requirement based on "'could have sought' relief available under the IDEA." *Id.* Thus, "[a] court deciding whether §1415(*l*) applies must . . . examine whether a plaintiff's complaint—the principal instrument by which she describes her case—seeks relief for the denial of an appropriate education." *Id.* "But that examination should consider substance not surface," because a complaint seeking relief under a statute other than the IDEA would not use the IDEA's distinctive language, such as FAPE or IEP, "[a]nd still more critically, a 'magic words' approach would make § 1415(*l*)'s exhaustion rule too easy to bypass." This is so, because "Section 1415(*l*) is not merely a pleading hurdle. It requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way." *Id.* at *11. Consequently, "a court should attend to the diverse means and ends of the statutes covering persons with disabilities," including the IDEA, the ADA, and the Rehabilitation Act, where "the IDEA guarantees individually tailored educational services, while Title II and § 504 promise nondiscriminatory access to public institutions." *Id.* [2]

---

[2] The Court set out a more detailed discussion of the differences between these three statutes, as follows:

> The IDEA, of course, protects only 'children' (well, really, adolescents too) and concerns only their schooling. §1412(a)(1)(A). And as earlier noted, the statute's goal is to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs.' §1401(29); *see [Board of*

(Footnote continued . . .

Justice Kagan then turned to indications of the "gravamen" of the complaint. First, she observed,

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking *a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject*; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. *But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so*; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Fry*, 2017 WL 685533 at *12 (emphasis added).

---

> *Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v.] Rowley*, 458 U. S. [176,] 192, 198 [(1982)]; *supra*, at 11. By contrast, Title II of the ADA and §504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools. And those statutes aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs.

*Fry*, 2017 WL 685533 at *11.

Next, Justice Kagain wrote, "A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings." *Id.* at *13. She explained,

> In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream. Recall that a parent dissatisfied with her child's education initiates those administrative procedures by filing a complaint, which triggers a preliminary meeting (or possibly mediation) and then a due process hearing. See *supra*, at 2-3. *A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE*—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy. *Whether that is so depends on the facts*; a court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely. *But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term.*

*Fry*, 2017 WL 685533 at *13 (emphasis added).

The Court concluded that the decisions below had not undertaken the analysis set forth in its opinion and that the Court lacked some important information. Consequently, the Court remanded that issue to the court below. *Id.*

In a concurring opinion, joined by Justice Thomas, Justice Alito concurred in all but the two "clues" that Justice Kagan offered to assist the lower courts, because, in his view, those clues "may have the opposite effect" and be "likely to confuse and lead courts astray." His concern with the two hypothetical questions posed by Justice Kagan was

that they "make sense only if there is no overlap between the relief available under the following two sets of claims," that is, IDEA claims on the one hand, and claims under other federal laws, on the other. *Id.* at *15 (Alito, J., concurring). He described the second clue, suggesting that the lower courts take into account whether parents began then abandoned IDEA procedures, as a "false" one, for the following reasons:

> This clue also seems to me to be ill-advised. It is easy to imagine circumstances under which parents might start down the IDEA road and then change course and file an action under the ADA or the Rehabilitation Act that seeks relief that the IDEA cannot provide. The parents might be advised by their attorney that the relief they were seeking under the IDEA is not available under that law but is available under another. Or the parents might change their minds about the relief that they want, give up on the relief that the IDEA can provide, and turn to another statute.

*Fry*, 2017 WL 685533 at *15 (Alito, J., concurring).

While the concurring justices were concerned that the "clues" offered by Justice Kagan may be confusing or misleading, my concern is that courts (and parties) will improperly view them as bright line tests, rather than "clues." As a consequence, they may not undertake a careful examination of the "substance not surface" of a plaintiff's claims to reach the "gravamen" of those claims, *see id.* at *11 (opinion by Kagan, J.), and may not make a careful review of the facts to determine whether commencement then abandonment of IDEA proceedings was a strategic move or was motivated by recognition that their grievance involves something other than denial of a FAPE, *id.* at *13.

### b. The Circuit's application of Fry

As mentioned, above, the Eighth Circuit Court of Appeals has addressed *Fry* only once, so far, in *J.M. v. Francis Howell Sch. Dist.*, No. 16-1756, ___ F.3d ___, 2017 WL 894460 (8th Cir. March 7, 2017). In *J.M.*, a parent alleged that, between January

2012 and September 2014, her disabled child was repeatedly placed in physical restraints and isolation without her knowledge. *Id*. at *1. She brought suit in federal court, originally asserting claims under 42 U.S.C. §§ 1983 and 1988, and state common-law, as well as the IDEA; then amended her complaint to add claims under the ADA and the Missouri Human Rights Act (MHRA); then amended, again, to remove the IDEA and common-law tort claims; and, ultimately, asserted "claims under the Equal Protection Clause, 42 U.S.C. §§ 1983 and 1988, the ADA, Section 504 of the Rehabilitation Act of 1973, and the MHRA." *Id*. Applying the standard in *Fry*, the Eighth Circuit Court of Appeals concluded that the district court had not erred in finding that the plaintiff's complaint sought relief for denial of a FAPE under the IDEA. *Id*. at *3.

The court explained,

> The second amended complaint states, "At all times mentioned above, [J.M.] was entitled to the educational services and protections available under the Individuals with Disabilities Education Act of 1975" and "at all times [J.M. was] entitled to reasonable accommodations" for his disabilities. It alleges that "[b]etween February 2014 and September 5, 2014, J.M. was placed in physical restraints for half of the time he actually spent at Defendant's schools." It further states that J.M. was "denied … because of his disability, participation in and the benefits of a public education." These allegations show that the complaint was based on the "denial of a FAPE" under the IDEA. *See [Fry*, 2017 WL 685533,] at *13 (determining the Fry's complaint "alleges only disability-based discrimination" and "contains no allegation … accus[ing] the school even in general terms of refusing to provide the educational instruction and services that E.F. needs").

> "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive

services' to permit the child to benefit from that instruction."
*Id.*, at *4, citing 20 U.S.C. §§ 1401(9), (26), (29). The ADA
and Section 504, on the other hand, forbid public entities and
federally funded programs or activities from discriminating
based on disability. *Id.*, at *5. The complaint here is not based
on disability discrimination. Except for Count IV (the MHRA
claim), the complaint does not use the word "discrimination."
Rather, the complaint is based on how the use of isolation and
physical restraints failed to provide proper "sufficient
'supportive services' to permit [J.M.] to benefit from …
instruction," *id.*, at *4, and ultimately "denied [J.M.] … the
benefits of public education." Finally, although [the plaintiff]
did not "invoke[ ] the IDEA's formal procedures to handle
the dispute," "the history of the proceedings," including her
initial complaint and first amended complaint contained
claims under the IDEA, which is "[a] further sign that the
gravamen of [the] suit is the denial of a FAPE." *See id.*, at
*13.

*J.M.*, 2017 WL 894460 at *3. The court also noted that the plaintiff had voluntarily
removed common-law tort claims, as the foundation for non-educational injuries, and
that the child's IEP was not used solely to show notice to the school of the conditions that
put the child at risk, but as a central dispute of the litigation, in part because the plaintiff
alleged that the defendants repeatedly violated the child's rights by utilizing isolation and
restraint on the child, which were not permitted within his IEP. *Id.* at *4. In other
words, "[t]he claims [in *J.M.*] [we]re based on the failure to implement J.M.'s IEP,
specifically regarding discipline." *Id.*

An issue that the Supreme Court did *not* address in *Fry*, because it concluded that
it was not necessary to resolve it at that time, was the following: "Is exhaustion required
when the plaintiff complains of the denial of a FAPE, but the specific remedy she
requests—here, money damages for emotional distress—is not one that an IDEA hearing
officer may award?" *Fry*, 2017 WL 685533 at *8 n.4. As to that issue, the Eighth

Circuit Court of Appeals observed, in *J.M.*, that "this court has noted that 'the IDEA's exhaustion requirement remains the general rule, regardless of whether the administrative process offers the particular type of relief that is being sought.'" *J.M.*, 2017 WL 894460 at *4 (quoting *J.B. ex rel. Bailey v. Avilla R-XIII School Dist.*, 721 F.3d 588, 592 (8th Cir. 2013), and citing decisions of other circuit courts of appeals so holding). Thus, the parent's "voluntary decision to remove J.M. from school, and seek only compensatory and punitive damages rather than compensatory education services, d[id] not exempt her from the exhaustion requirement." *Id.*

### c. *Application of* **Fry** *here*

Although the *Fry* test is not a "magic words" test, 2017 WL 685533 at *11, in determining the "gravamen" of the Gosches' Complaint, it is helpful to see what references to the IDEA are found in the Complaint. *See J.M.*, 2017 WL 894460 at *3 (surveying the allegations in the complaint to determine the gravamen of the claims). The Gosches' Complaint does allege that KG was "a special education student," Complaint at ¶ 7; indeed, it alleges that, "[a]s a result of his disability, K.G. was made eligible for special education services and supports pursuant to the Individual with Disabilities Education Act ('IDEA'), 20 U.S.C. §§ 1401 *et seq.*," *id.* at ¶ 14. It also alleges Riediger was "a special education teacher," whose responsibilities included "providing the structure and consistency that would enable a child with emotional, cognitive and developmental disabilities such as K.G. to access an appropriate education and progress academically as well as emotionally and behaviorally," *id.* at ¶ 9, and that Adams was "responsible for the hiring, training and supervision of school staff and ensuring that all students attending Primary School were afforded equal access to a public education," *id.* at 10. Thus, the Complaint identifies the parties in terms of needing or supplying "special education services" and having a duty to ensure "equal access to a public education." Nevertheless, unlike the references to the IDEA in *J.M.*, these are not

allegations about the "'denial of a FAPE'" under the IDEA or allegations that are a "central dispute of this litigation," but allegations "show[ing] notice to the [defendants] of the conditions that put [KG] at risk." *J.M.*, 2017 WL 894460 at *4.

Furthermore, of the 29 paragraphs of general factual allegations in the Complaint, only one paragraph relates to alleged violation of KG's IEP or BIP under the IDEA. Even that paragraph is just one of three in the general factual allegations alleging the way in which conduct by Riediger was "wrongful," as follows:

> 33.    Defendant RIEDIGER lacked any legitimate or lawful basis or cause to engage in the type of physical force she used against K.G. on the morning of January 30, 2014.

> 34.    At all relevant times herein, K.G. never engaged in behavior that rose to the level of an emergency or a serious or probable or imminent threat of harm to himself or to others that would justify Defendant RIEDIGER's actions in grabbing and dragging him across the classroom floor. In fact, Defendant RIEDIGER later admitted to police that K.G. did not make contact with her or with any students in the classroom prior to her use of physical force against him.

> 35.    Moreover, Defendant RIEDIGER's actions were in violation of K.G.'s IEP, which did not provide for or anticipate the use of physical force such as that used against him on the morning of January 30, 2014. K.G.'s IEP contains a Behavior Implementation Plan ("BIP") which outlines the appropriate steps a special education teacher or paraprofessional should take when confronted with behaviors of concern. In particular, the BIP provides that in regards to "[a]ctions needed to ensure safety and the de-escalation of student behaviors in emergency situations", if K.G. is in a classroom, then "the other students will be removed."

Complaint at ¶¶ 33-35. Thus, the "gravamen" of the wrongfulness of Riediger's conduct in the Complaint's general factual allegations is not that it violated the IDEA, but that it

involved unlawful and unreasonable use of physical force against KG. The allegation that the use of force was contrary to the IEP and BIP is made as an indication of the *unreasonableness* of the use of force, not as the *gravamen* of the wrongfulness of the conduct.

Moreover, violation of the IEP and BIP are not the central allegations of wrongfulness of the conduct in any of the six claims for relief in the Complaint. Rather, in the First Claim For Relief, the § 1983 claim, the allegations of wrongful conduct by Riediger are that she "violated K.G.'s rights under the Fourth Amendment and Fourteenth Amendment by using unjustified and unreasonable force against him." *Id*. at ¶ 46; *see also id*. at ¶ 48 (alleging that Riediger's conduct in "seizing and dragging K.G. unlawfully subjected him to excessive, unreasonable, and unnecessary physical force"). Although paragraph 47 alleges that Riediger's conduct "was objectively unreasonable under the circumstances *and in light the educational objectives K.G. was trying to achieve*," (emphasis added) that allegation, again, is to show the "unreasonableness" of Riediger's conduct, not the "gravamen" of her wrongful conduct, which is the use of "unjustified and unreasonable force" against KG. *Id*. at ¶¶ 46, 48. Likewise, in the § 1983 claim, the allegation of the wrongfulness of Adams's conduct is not that it violated KG's IEP or BIP, but that it involved "deliberate indifference to the risk of harm to KG" from inadequate training and supervision of faculty and staff "in the use of force and restraint when seizing special education students with disabilities." *Id*. at ¶ 49.

The same is true of the other federal claims in the Second and Third Claims For Relief, alleging violations of the ADA and the Rehabilitation Act, respectively. The "gravamen" of the ADA claim is discrimination and creation of a hostile educational environment toward KG because of his disabilities. *See id*. at ¶ 56 ("SBLCSD has failed in its responsibilities under Title II *to provide its services, programs and activities in a full and equal manner to disabled persons* as described hereinabove, including failing to

ensure that educational services *are provided on an equal basis to children with disabilities and free of hostility toward their disability*." (Emphasis added)); *id.* at ¶ 57 ("SBLCSD has further failed in its responsibilities under Title II to provide its services, programs and activities *in a full and equal manner to disabled persons* as described hereinabove *by subjecting Plaintiff K.G. to a hostile educational environment*." (Emphasis added)). The "gravamen" of the Gosches' Rehabilitation Act claim is also denial of equal access to services and creation of a hostile educational environment toward KG because of his disability. *See id.* at ¶ 62 ("By its actions or inactions in *denying equal access to educational services and by subjecting Plaintiff K.G. to a hostile educational environment*, defendant has violated Plaintiff's rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.").

Turning to the common-law claims, the "gravamen" of the negligence claim in the Gosches' Fourth Claim For Relief is violation of a duty of care by "subjecting him to unwarranted and unnecessary physical force in disciplining him and/or seeking his compliance," *see id.* at ¶ 63, which is well beyond the scope of a FAPE. Even the specifications of negligence, while in the school context, are allegations of negligent supervision, investigation, failure to keep KG safe, failure to act reasonably, and inflicting harm, all allegations unrelated to or beyond the scope of a FAPE. *See id.* at ¶ 64. Finally, the common-law claims of battery and intentional infliction of emotional distress are based on allegations of threats of violence and physical injury and the outrageousness of such conduct, irrespective of any requirement of a FAPE, KG's IEP, or KG's BIP. *See id.* at ¶¶ 67-68 (battery claim based on allegations "Defendant RIEDIGER intentionally and unlawfully threatened, had the then present ability to do violence toward Plaintiff K.G., and caused physical injury to Plaintiff K.G." and "Defendant RIEDIGER placed Plaintiff K.G. in reasonable and serious apprehension of

harmful and offensive contact, and did, in fact, intentionally cause physical pain and injury to Plaintiff K.G."); *id.* at ¶¶ 71-72 (intentional infliction of emotional distress based on allegations "The Defendants conduct was reckless and/or outrageous and in wanton disregard of the rights and safety of Plaintiff K.G." and "The Defendants acted intentionally and/or with reckless disregard of the probability of causing emotional distress.").

The conclusion that the "gravamen" of the Gosches' claims is not relief for denial of a FAPE is bolstered by reference to the first of the "clues" identified by Justice Kagan in *Fry*. 2017 WL 685533 at *12. Plainly, the plaintiff could have brought essentially the same claims for excessive and unreasonable use of force and discrimination, if the alleged conduct had occurred at a different public facility. *Id.* Just as plainly, an adult at the school, such as an employee or visitor, could have pressed essentially the same grievances. *Id.* In these circumstances, it is highly unlikely that the Gosches' complaint is truly about denial of a FAPE. *Id.*

Indeed, the only suggestion, here, that this case has anything at all to do with the IDEA is that, in the history of the proceedings, the Gosches initially chose to pursue the administrative process under the IDEA, and did allege violation of KG's IEP and BIP, but then abandoned those proceedings. *Id.* at *13. There is nothing strange about parents of a child who has an IEP in place to protect his or her right to a FAPE turning, first, to administrative proceedings to secure a FAPE or otherwise to address wrongdoing of a special education provider, as both a familiar and readily-available forum that might provide them with the most immediate relief. As the majority and concurring justices in *Fry* all suggested, there is nothing unusual about parents of a child with an IEP initially asserting an administrative claim under the IDEA, only later to discover, when they have had the opportunity to consult with counsel, that either the IDEA does not provide the appropriate relief or that their claim is not about a violation of the IDEA at all. Thus,

27

with the *Fry* majority's caution to consider the facts to determine whether abandonment of the administrative proceedings was strategic or because of a realization that the grievance had to do with something other than a FAPE, *see id.*, and the concurring justices' caution that other federal laws provide relief that the IDEA could not, *Fry*, 2017 WL 685533 at *15 (Alito, J., concurring), I do not find that the Gosches' decision to pursue claims under other laws and procedures was merely strategic. Rather, in light of their allegations, they are now pursuing claims that address the "gravamen" of the wrongful conduct at issue and the appropriate relief. This is not simply a case in which the Gosches seek *remedies* that are not available under the IDEA, in which case exhaustion would still be required, *see J.M.*, 2017 WL 894460 at *4, but one in which the *wrongs* and the *remedies* are both beyond the scope of the denial of a FAPE under the IDEA.

The defendants are not entitled to summary judgment on the ground that the Gosches failed to exhaust administrative remedies under the IDEA.

### C.    The § 1983 Claims

The defendants argue that, even if exhaustion was not required, they are entitled to summary judgment on the Gosches' § 1983 claim. The Gosches disagree.

#### 1.    Arguments of the parties

The defendants contend that it appears that the Eighth Circuit Court of Appeals follows the approach of other circuits by measuring claims of excessive force by public school officials against the Fourteenth Amendment substantive due process "shocks the conscience" standard, not against the Fourth Amendment "reasonableness" standard. They assert that there was nothing "shocking" or "irrational" about Riediger's response to KG's conduct, because Riediger reasonably believed that KG was in a position to hurt himself or one of his fellow students, she made a "split second decision" to move him

out of harm's way, she took reasonable action to do so, and she stopped immediately when KG complained of pain. They argue that there is no evidence that Riediger was angry or took any action maliciously, sadistically, or for the purpose of causing harm, nor evidence of bad faith or ill will toward KG. Thus, they contend that the Fourteenth Amendment excessive force claim fails as a matter of law.

In response, the Gosches argue that they have asserted both Fourth Amendment and Fourteenth Amendment claims, but the defendants have sought summary judgment only on the Fourteenth Amendment claim. More specifically, the Gosches argue that a Fourth Amendment claim is viable when an unreasonable *seizure* has occurred, such as occurred in this case, when Riediger grabbed KG's legs and dragged him toward the "chill out zone." They point to Eighth Circuit precedent analyzing claims against school officials involving the use of restraints and seclusion under the Fourth Amendment "reasonableness" standard, and claims involving abuse, such as yelling, demeaning, and belittling, or application of force without a seizure, under the "shocks the conscience" standard of the Fourteenth Amendment. Furthermore, the Gosches argue that the "seizure" of KG was clearly unreasonable, where, for example, the *defendant's* expert has opined that nothing in "Mandt training" would have allowed a teacher to drag a student across a carpeted floor, and their own expert agrees that there is no situation in which such dragging would be appropriate.

The Gosches argue that there are also triable issues as to their Fourteenth Amendment claim, because there was no need for Riediger to apply force in the situation in question, nor, indeed, was there any need to make a "split second decision"; dragging KG was patently unacceptable; KG suffered well-documented physical and psychological injuries as a result of Riediger's use of force and is less resilient to overcome the incident because of his pre-existing autism and other disorders affecting communication; and there is evidence that Riediger acted with malice, in light of a pattern of using force to ensure

29

KG's compliance. In sum, they argue that, when viewed in the light most favorable to them as the non-moving parties, there is sufficient evidence from which a jury could conclude that the defendants' actions violated KG's substantive due process rights.

### 2. *Analysis*

As the Gosches argue, the Eighth Circuit Court of Appeals has recognized both Fourth and Fourteenth Amendment claims arising out of the conduct of school officials in certain circumstances. Specifically,

> A litigant may state a Fourth Amendment violation by alleging facts which indicate a seizure occurred and that it was unreasonable. *See McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir.2003). Moreover, the Fourth Amendment's protections extend to actions by public school officials. *See, e.g., Couture v. Bd. of Educ.*, 535 F.3d 1243, 1250–52 (10th Cir.2008); *Shade v. City of Farmington*, 309 F.3d 1054, 1059–62 (8th Cir.2002).

*C.N. v. Wilmar Pub. Schs., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 633 (8th Cir. 2010). In addition, a student can assert a Fourteenth Amendment substantive due process claim based on allegations that a school official's actions "'violated one or more fundamental constitutional rights' and were 'shocking to the contemporary conscience.'" *Id.* at 634 (quoting *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007)). Thus, the defendants' contention that a Fourth Amendment claim is not available in this context is wrong, as a matter of law. As explained, above, the Gosches contend that they have alleged constitutional claims pursuant to both the Fourth and Fourteenth Amendments. I will analyze whether the Gosches' constitutional claims otherwise overcome the defendants' motion for summary judgment.

### a. *The Fourth Amendment "seizure" claim*

As to a Fourth Amendment "seizure" claim, the Eighth Circuit Court of Appeals has explained,

> Reasonableness is judged in light of the totality of the circumstances, however, *McCoy*, 342 F.3d at 848, and "[c]ontext is [therefore] critical to reasonableness analysis." *Couture*, 535 F.3d at 1251. And in a school setting, "[t]he Fourth Amendment's reasonableness inquiry … must account for 'the schools' custodial and tutelary responsibility' over the students entrusted to their care." *Shade*, 309 F.3d at 1059 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)).

*C.N.*, 591 F.3d at 633. The Eighth Circuit Court of Appeals has also explained that a "seizure" within the meaning of the Fourth Amendment involves the willful or intentional application of physical force involving a "restraint" on a person's "freedom of movement." *See, e.g., Atkinson v. City of Mt. View, Mo.*, 709 F.3d 1201, 1208 (8th Cir. 2013); *see also C.N.*, 591 F.3d at 633 (assuming that a child was seized within the meaning of the Fourth Amendment when a teacher placed him in restraints and seclusion).

As the Gosches point out, the defendants' only argument for summary judgment on this claim was that no such claim was recognized in this Circuit, but I concluded, above, that the defendants' argument was wrong as a matter of law. *Compare Cremona*, 433 F.3d at, 620 (summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute). Thus, the defendants have failed to carry their responsibility to obtain summary judgment on the basis that there is no genuine factual dispute, because they have not "identif[ied] 'those portions of [the record] . . . which [they] believe[ ] demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (quoting *Celotex*, 477 U.S. at 323).

In contrast, the Gosches have met their burden to generate genuine issues of material fact that Riediger's use of force on KG was a "seizure," within the meaning of the Fourth Amendment. *Id*. (in response to a motion for summary judgment, "[t]he

nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" (quoting *Matsushita Elec. Indus. Co.* 475 U.S. at 586–87)). They have pointed to evidence that Riediger grabbed KG by his ankles and "dragged" him along the floor, and that such grabbing and moving was precisely for the purpose of restraining his freedom of movement, whether it was to prevent him from kicking other children or to move him to the "chill out zone." *C.N.*, 591 F.3d at 633 (first element of a Fourth Amendment claim). Thus, there are genuine issues of material fact on the "seizure" element of their Fourth Amendment claim.

The Gosches have also generated genuine issues of material fact on the "unreasonableness" of that seizure, *id.* (second element), even recognizing that, "in a school setting, '[t]he Fourth Amendment's reasonableness inquiry . . . must account for "the schools' custodial and tutelary responsibility" over the students entrusted to their care,'" *id.* (quoting *Shade*, 309 F.3d at 1059). If I could construe the defendants' Motion to have put at issue the "unreasonableness" or "reasonableness" of Riediger's conduct, within the meaning of the Fourth Amendment, there is still a jury question on the reasonableness of Riediger's actions. This is so, where the Gosches have pointed to evidence to support this element, including the agreement of the experts that it would be improper to "drag" a child as a form of discipline or control and the opinion of a medical provider that KG's injuries are consistent with "forceful dragging" sufficient to cause "partial thickness skin burns" indicative of infliction of injuries "beyond what is considered normal care and discipline of a 7-year-old child." This evidence is enough to suggest that Riediger's conduct was a "substantial departure" from accepted professional judgment, practice, or standards. *Id.* at 633. Indeed, the defendants cannot argue, like the defendants in *C.N.*, that Riediger's actions were authorized by KG's IEP, *compare id.*, because there is no authorization for the use of force to grab KG's ankles to move

him to the "chill out zone," or, indeed, any other specific authorization for the use of force as a means to obtain his compliance, to be found in his IEP.

Finally, the Gosches have generated genuine issues of material fact on this claim against Adams, by pointing to evidence that she was deliberately indifferent to the risk of harm to KG from inadequate training and supervision of faculty and staff in the use of force and restraint when seizing special education students with disabilities. They have pointed to evidence that Adams had, herself, dragged KG on one occasion and that she failed to ensure that Riediger had had "Mandt training" until after the incident in question here.

The defendants' Motion For Summary Judgment is denied as to the merits of the Gosches' Fourth Amendment claim.

### b. The Fourteenth Amendment "substantive due process" claim

The Gosches' Fourteenth Amendment "substantive due process" claim requires them to prove "actions by a government official which 'violated one or more fundamental constitutional rights' and were shocking to the contemporary conscience.'" *C.N.*, 591 F.3d at 834 (stating these as pleading requirements for such a claim (quoting *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007)). As the Eighth Circuit Court of Appeals has explained, this is "a high standard," because

> [S]ubstantive due process is concerned with violations of personal rights … so severe … so disproportionate to the need presented, and … so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience.

*C.N.*, 591 F.3d at 634 (quoting *Golden v. Anders*, 324 F.3d 650, 652–53 (8th Cir. 2003)).

Because the "shocks the conscience" standard under the Fourteenth Amendment is much higher than an "unreasonableness" standard under the Fourth Amendment,

whether there are genuine issues of material fact on the Fourteenth Amendment claim is a much closer question. Also, as to the Fourteenth Amendment claim, the defendants *have* met their initial responsibility to identify evidence that they believe shows that Riediger's response to KG's conduct was not "shocking" or "irrational," because Riediger reasonably believed that KG was in a position to hurt himself or one of his fellow students, made a "split second decision" to move him out of harm's way, took reasonable action to do so, and stopped immediately when KG complained of pain. In response, however, the Gosches have pointed to evidence, including the experts' opinions and the medical professional's opinion that dragging a child in a way that caused carpet burns was inappropriate and disproportionate to any circumstances presented by KG's conduct, and evidence that the incident continued with little escalation for ten minutes, undermining any argument that Riediger's conduct was based on a "split second decision" to move KG out of harm's way or to prevent him from harming others.

Notwithstanding the Gosches' arguments, I cannot find that there is a genuine issue of material fact that Riediger acted with "malice." *Id.* (the plaintiff must show that the conduct was "inspired by malice or sadism rather than a merely careless or unwise excess of zeal"). Riediger's conduct was "intentional," as required for a Fourth Amendment claim, *see Atkinson*, 709 F.3d at 1208, but there is no reasonable inference that it was "malicious." The Eighth Circuit Court of Appeals has declined to find any inference of malice, where there was no evidence that the actor disliked or had any animus toward the alleged victim. *See Golden*, 324 F.3d at 854. Evidence that KG thought Riediger was "mean" is a far cry from evidence that Riediger had any dislike or animus toward KG. Although there may be evidence that Riediger was not the first person at the school to use force against KG to ensure his compliance, there is no evidence of a "pattern" of such conduct by Riediger that might suggest a negative animus toward KG. I also do not find that a reasonable juror could infer "malice" from the nature and extent of KG's

injuries, as suggesting that they were maliciously inflicted, even if the injuries do suggest that Riediger was "merely careless" or acted with an "unwise excess of zeal." *C.N.*, 591 F.3d at 634 (quoting *Golden*, 324 F.3d at 652–53). Any inference of "malice" is further negated by the undisputed fact that Riediger went through an entire series of techniques to try to de-escalate the situation before ever resorting to an attempt to move KG physically, as well as by the undisputed fact that Riediger stopped moving KG at the first indication that her conduct was causing him pain and promptly sought medical attention for KG's injuries.

Therefore, the defendants *are* entitled to summary judgment on the merits of the Gosches' Fourteenth Amendment claim.

### c. *Qualified immunity*

The defendants argue, in the alternative, that if they are not entitled to summary judgment on the merits of the Gosches' Fourteenth Amendment claim, the individual defendants are entitled to summary judgment on the basis of their qualified immunity to that claim. The defendants argue that, even if there was a Fourteenth Amendment violation, it is clear that a reasonable person would not have known that Riediger's and Adams's conduct violated KG's constitutional rights.[3] They argue that no reasonable person would have believed that Riediger's conduct violated KG's constitutional rights, where Riediger went through the process of using various techniques to try to de-escalate the situation, ultimately acted to protect KG's safety, moved him only a short distance, and quit when he complained of pain. In response, the Gosches argue that it is well-

---

[3] Again, the defendants have made this argument only as to the Gosches' Fourteenth Amendment claim, so that they are not entitled to summary judgment in their favor as to qualified immunity on the Gosches' Fourth Amendment claim. Even if the defendants had properly presented the question of qualified immunity as to the Gosches' Fourth Amendment claim, qualified immunity likely would have been denied.

established that students have a right to be free from restraint and mistreatment, so that no reasonable special education teacher would have believed that it is lawful to seize and then drag a disabled seven-year-old child across the floor by his ankles in a manner that caused serious carpet burns.

As the Eighth Circuit Court of Appeals explained, in *C.N.*, "Qualified immunity protects individual state actors from liability under § 1983 unless they violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" 591 F.3d at 632 (quoting *Brockinton v. City of Sherwood*, 503 F.3d 667, 671 (8th Cir. 2007)). In *C.N.*, the court reached only the "violation" prong of the qualified immunity analysis, not the question of whether a "reasonable person" would have known that the conduct violated the alleged victim's constitutional rights. *Id.* The same is true, here: Because I have found no Fourteenth Amendment violation, the defendants are also entitled to qualified immunity on the Fourteenth Amendment claim.

Assuming, contrary to my conclusion, above, that the Gosches' *had* generated genuine issues of material fact that there was a Fourteenth Amendment violation, I conclude that the defendants are entitled to qualified immunity on the "reasonable person would have known" prong of the analysis. *Id.* (second requirement of qualified immunity). In *Mathers v. Wright*, 636 F.3d 396 (8th Cir. 2011), the Eighth Circuit Court of Appeals explained that the district court had properly denied a school official qualified immunity on an "equal protection" claim, because the school official's conduct "exceed[ed] the scope of professionally acceptable choices and stem[med] from an improper motivation," which the court concluded was "consistent with decisions from other courts [that] have denied qualified immunity to a school official accused of [unconstitutional conduct] against a student in the absence of a rational basis to do so." 636 F.3d at 402. While I found, above, that there were genuine issues of material fact as to whether Riediger's conduct "exceed[ed] the scope of professionally acceptable

choices," I reiterate that there are no genuine issues of material fact that Riediger's actions "stem[med] from an improper motivation." *Id.*

Therefore, the defendants *are* also entitled to summary judgment on the Gosches' Fourteenth Amendment claim on the basis of qualified immunity, but *not* on their Fourth Amendment claim.

### D.    The Disability Discrimination Claims

The defendants argue that they are entitled to summary judgment on the Gosches' claims pursuant to Title II of the ADA and § 504 of the Rehabilitation Act. The Gosches argue to the contrary.

The defendants argue that the benefit that KG was allegedly denied because of his disability is a FAPE. They argue that KG continues to receive a FAPE, because of his enrollment in a different district providing a FAPE, albeit at the expense of the defendant District. In response, the Gosches contend that this argument fails to recognize that the appropriate educational duty under the IDEA is not identical with the District's duty not to discriminate on the basis of disability under Section 504 or the ADA. They argue that KG's disability discrimination claims are that he sustained damages from being subjected to a hostile educational environment because of his disability, which is wholly unrelated to the IEP process, which involves individual identification, evaluation, educational placement, and free appropriate education decisions. They also contend that KG continues to suffer the consequences of the discriminatory conduct, notwithstanding that he has been enrolled in a school in another district.

The Eighth Circuit Court of Appeals has "'held that the enforcement, remedies, and rights are the same under both Title II of the ADA and § 504 of the Rehabilitation Act.'" *B.M. ex rel. Miller v. South Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013) (quoting *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir.

2000)).  The court has also "consistently held that '[w]here alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that school officials acted in bad faith or with gross misjudgment.'"  *Id.* (quoting *Birmingham*, 220 F.3d at 856, and also citing *M.Y. ex rel. J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 888 (8th Cir. 2008)).

For the reasons, cited above, that I conclude that the "gravamen" of the Gosches' ADA and Rehabilitation Act claims is *not* a denial of a FAPE, I now reject the defendants' argument that, simply because KG is obtaining educational services from another school district, the defendants are entitled summary judgment on KG's disability discrimination claims.  Indeed, the alleged ADA and § 504 claims are not based solely or substantially on educational services for disabled children, but on subjecting a disabled student to a hostile environment because of his disability.  Thus, "bad faith" is not a requirement of such a claim.  *Id.*

The defendants are not entitled to summary judgment on the Gosches' disability discrimination claims.


### E.     The Common-Law Claims

As explained, above, the Gosches assert Iowa common-law claims of "general negligence" against Riediger, Adams, and the District, battery against Riediger, and intentional infliction of severe emotional distress against Riediger, Adams, and the District.  I will consider the defendants' grounds for summary judgment on each of these claims, in turn, at least briefly.

#### 1.     The negligence claim

In their "general negligence" claim, the Gosches allege that the defendants breached the duty of care owed to KG, in one or more of the following ways: (a) negligent supervision of classroom teachers; (b) negligent investigation of allegations

of wrongdoing; (c) failing to keep KG safe and free from harm; (d) failing to act as reasonable teachers and school administrators; and (d) inflicting harm upon KG.

The defendants argue that the Gosches cannot cite to any evidence that the District in general, or Kelly Adams in particular, failed to supervise Miranda Riediger, nor can the Gosches credibly claim that the incident involving KG was a proximate result of those defendants' failure to supervise. Furthermore, they argue that it was simply not foreseeable that grabbing a seven-year-old child by the ankles and taking two steps back would result in injury. Rather, they reiterate that Riediger acted reasonably. The Gosches counter that Riediger's conduct in seizing and dragging a student was foreseeable, particularly since Adams had previously engaged in the exact same conduct by dragging KG across a floor, and that it was reasonably foreseeable that a child would suffer carpet burns from being dragged across a carpeted floor. They also contend that a reasonable juror could conclude that it was unreasonable for Riediger to engage in conduct that neither his parents nor his prior school had tolerated and that Riediger acted out of frustration or anger, not fear that KG might injure himself or others.

The defendants argue that negligent investigation or supervision of the investigation *after* the incident cannot be the proximate cause of any of KG's injuries, which allegedly arose *from* the incident. The Gosches make no attempt to resist summary judgment on the allegation of negligent investigation. Thus, the defendants are entitled to summary judgment on this specific allegation of negligence.

The defendants are not entitled to summary judgment on any of the other allegations of negligence, however. The Gosches have met their burden in response to the defendants' Motion For Summary Judgment to point to evidence generating a jury question on whether Riediger's conduct was unreasonable, for the reasons set out, above. *Torgerson*, 643 F.3d at 1042. They have also generated a jury question on whether either allegedly dragging a child across a carpeted floor or injury from such conduct were

39

foreseeable, by pointing to evidence that Adams had allegedly engaged in similar conduct and a reasonable person's commonsense recognition of the fact that dragging a child across a carpeted floor can result in carpet burns.

### 2. *The battery claim*

The defendants argue that they are entitled to summary judgment on the Gosches' "battery" claim, because Riediger is immune to criminal liability, pursuant to IOWA CODE § 280.21(2), for reasonable action to protect an employee, student, or other students.[4] They argue that Riediger reasonably believed that KG was likely to harm himself or others if she did not intervene and the nature of her intervention was reasonable. While the Gosches agree that statutory immunity does exist, they argue that it is not applicable, here, because Riediger's conduct was not reasonable. Again, for the reasons stated, above, a reasonable juror could conclude that Riediger's conduct was not "reasonable under the circumstances [to] [p]rotect[ ] the employee, the student, or other students." IOWA CODE § 280.21(2)(b).

---

[4] IOWA CODE § 280.21(2) provides, in pertinent part, as follows:

> 2. A school employee who, in the reasonable course of the employee's employment responsibilities, comes into physical contact with a student shall be granted immunity from any civil or criminal liability which might otherwise be incurred or imposed as a result of such physical contact, *if the physical contact is reasonable under the circumstances and involves the following*:
>
> * * *
>
> b.  Protecting the employee, the student, or other students.

Emphasis added.

The defendants are not entitled to summary judgment on the Gosches' "battery" claim.

### 3.     *The "intentional infliction of emotional distress" claim*

As to the Gosches' last claim, for intentional infliction of emotional distress, the defendants argue, again, that the conduct that the Gosches claim was outrageous is the incident in the classroom, but moving a child two steps away from other students and a heavy metal desk, as a last resort, in an effort to protect the student and his classmates from physical harm, is not outrageous; it is required.  The Gosches counter that the outrageousness of the conduct at issue in this case arises from Riediger's authority over KG and her abuse of that authority.

I agree with the defendants that the Iowa Supreme court has held that it "is for the court to determine in the first instance whether the relevant conduct may reasonably be regarded as outrageous." *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983).  For essentially the same reasons that I find that the Gosches have failed to generate a jury question on whether Riediger's conduct "shocks the conscience" and was "malicious," I now conclude, in the first instance, that Riediger's conduct cannot reasonably  be regarded as outrageous. *Id.*

Thus, the defendants are entitled to summary judgment on the Gosches' "intentional infliction of emotional distress" claim.

### III.     CONCLUSION

While I conclude that some of the Gosches' claims should proceed to trial, I do not want to leave anyone with the impression that this is not a very close case, even on those claims.  I have focused on what reasonable jurors could conclude, taking the evidence in the light most favorable to the Gosches, as I am required to do at summary judgment. *See Torgerson*, 643 F.3d at 1042.  I hasten to add, however, that reasonable

jurors could find, at trial, based on the evidence and arguments almost identical to the ones that the defendants make here, at summary judgment, that Riediger's conduct was entirely reasonable under the circumstances presented—I certainly recognize that those circumstances were very difficult. Teachers face increasing challenges, it seems, in meeting their obligations to foster learning, while keeping *all* their students safe. I do not envy them that daunting task. Nor do I envy the jurors the daunting task of deciding what the facts show in this case.

Upon the foregoing, the defendants' January 20, 2017, Corrected Motion For Summary Judgment (docket no. 29) is **granted in part and denied in part**, as follows:

1.      The defendants' Motion is **denied** as to failure to exhaust claims pursuant to the IDEA, because, applying the *Fry* test, the Gosches were not required to exhaust their non-IDEA claims;

2.      The defendants' Motion is **denied** as to the Gosches' § 1983 claim of a violation of the Fourth Amendment;

3.      The defendants' Motion is **granted** as to the Gosches' § 1983 claim of a violation of the Fourteenth Amendment;

4.      The defendants' Motion is **denied** as to the Gosches' disability discrimination claims pursuant to Title II of the ADA and § 504 of the Rehabilitation Act;

5.      The defendants' Motion is **granted** as to that part of the Gosches' "general negligence" based on a negligent investigation, but otherwise **denied** as to that claim;

6.      The defendants' Motion is **denied** as to the Gosches' battery claim; and

7.     The defendants' Motion is **granted** as to the Gosches' claim of intentional infliction of emotional distress.

**IT IS SO ORDERED**.

**DATED** this 23rd day of March, 2017.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA